IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

William F. Emlich, Jr., D.O., et al.,

        Case No. 2:14-cv-1697

        Plaintiffs,

    v.                         Judge Graham

OhioHealth Corp., et al.,

        Defendants.

Opinion and Order

Dr. William F. Emlich, Jr. and his medical practice, Associates in Gastroenterology and Hepatology, Inc., bring this action relating to the termination of his clinical and medical staff appointment privileges at various hospitals within the system operated by OhioHealth Corporation. Named as defendants are OhioHealth, its hospitals, and various medical professionals who participated in the process that culminated in the termination of Dr. Emlich's privileges.  The complaint asserts numerous claims, including a claim under the Sherman Act, 15 U.S.C. §§ 1, 2, in which defendants are alleged to have acted in combination to limit Dr. Emlich's trade as a physician by terminating his privileges.

The matter is before the court on defendants' motion for summary judgment, which is limited to the issue of whether defendants are immune from damages pursuant to the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, *et seq*.  For the reasons set forth below, the court grants the motion for summary judgment.

I.    **Background[1]**

    A.    **The Concerns Regarding Dr. Emlich's Practice**

Dr. Emlich has practiced medicine in Ohio for several decades and is certified in gastroenterology, hepatology and internal medicine.  In 1989 he obtained privileges at Doctors Hospital ("the Hospital") in Columbus, Ohio.  The Hospital later became part of the OhioHealth system.

---

[1]  In this section the court summarizes a voluminous factual record, which was created during the administrative process that led to the termination of Dr. Emlich's privileges.

Quality of care concerns first arose regarding Dr. Emlich's practice at the Hospital in 2004, when a patient passed away following a gastrointestinal procedure performed by Dr. Emlich. Pursuant to Hospital bylaws, a Clinical Quality Committee ("CQC") at the Hospital referred the case for external review by two physicians. (Doc. 15 at MEC0038). The external review found "multiple occasions when the medical care was below the generally accepted standards of medical care and likely contributed to the patient's injury and death." (Id. at MEC0192 (noting that the "most serious deviation occurred with the performance of endoscopy in an unstable patient in the patient's room instead of in the ICU")). The Hospital conducted a six-month random medical record review of Dr. Emlich's patients, but no further incidents or concerns were found.

Concerns next arose in 2006 and 2007 regarding Dr. Emlich's performance of two Endoscopic Retrograde Cholangio-Pancreatography ("ERCP") procedures. The CQC sent the cases, in which both patients died, for external review. The review in the first case found that Dr. Emlich, among other failings, had made an incorrect diagnosis, failed to identify an "intra-procedural retroperitoneal perforation," and provided inadequate fluid management. (Doc. 15 at MEC0298-302). The review concluded that the care provided by Dr. Emlich did not satisfy "the generally accepted standards of care and directly contributed to the patient's injury and death." (Id. at MEC0302). In the second case, the review found that Dr. Emlich had not supported or justified the need to perform a "highly invasive ERCP maneuver" that resulted in substantial bleeding and had failed to give transfusion platelets to stop the bleeding. (Id. at MEC0329-30). The review concluded that Dr. Emlich "deviated from the generally accepted standards of care and directly contributed to the patient's injury and subsequent death." (Id. at MEC0331). The CQC recommended that Dr. Emlich's next 25 ERCP cases be proctored (a recommendation that the Hospital's Medical Executive Committee ("MEC") accepted), but Dr. Emlich elected instead to not perform ERCPs going forward. (Id. at MEC0140, MEC0149).

In 2008, the CQC internally reviewed a case raising concerns about Dr. Emlich's decision to proceed with total parenteral nutrition ("TPN") through a peripherally inserted central catheter. The CQC concluded that his decision was "questionable," but no further action was recommended. (Doc. 15 at MEC0496).

In 2012, concerns were raised in several cases, the reviews of which became the procedural vehicle by which Dr. Emlich's privileges were terminated. In what the records refer to as the fourth external review (the 2004, 2006 and 2007 cases being the first three), Dr. Emlich had treated two separate patients with TPN administered through a Groshong catheter. The external review was

conducted by John A. Martin, M.D., the Chief of Endoscopy in the Division of Gastroenterology at the Northwestern University School of Medicine in Chicago, Illinois and the Medical Director of the Endoscopy Unit and Gastrointestinal Laboratory at Northwestern Memorial Hospital.

In the first case within the fourth external review, Dr. Martin found a basis to question Dr. Emlich's diagnosis of hereditary pancreatitis, his course of treatment and his decision to place the patient on TPN. (Doc. 15 at MEC0338-46). Dr. Martin concluded that the provision of care "was not optimal and resulted in poor nutritional decision-making and a protracted hospital stay." (Id. at MEC0346). In the second case, Dr. Martin again questioned Dr. Emlich's diagnosis of hereditary pancreatitis and the decision to treat the patient with TPN. (Id. at MEC0353-55). And he concluded that the quality of care provided by Dr. Emlich "was not optimal and resulted in poor nutritional decision-making and a protracted hospital stay without resolution of the patient's symptoms or laboratory abnormalities." (Id. at MEC0355). Dr. Martin also found in both cases that Dr. Emlich had failed to create proper documentation of the patients' symptoms and of the basis for his course of treatment. (Id. at MEC0344-46, MEC0355).

Before Dr. Martin had completed the fourth external review, another case occurred in which quality of care concerns were raised. The patient suffered a perforation of the colon during a colonoscopy performed by Dr. Emlich. Following a colectomy to remedy the perforation, the patient suffered gastrointestinal bleeding, renal dysfunction, portal vein thrombosis, and ultimately experienced a decline and failure of his bodily systems. An initial evaluation by the Hospital categorized the matter as a "potential preventable death" and the matter was referred to the MEC.[2] (Doc. 13-2 at 179). The MEC referred the matter to two of the Hospital's own gastroenterologists, who concluded that the care provided by Dr. Emlich was substandard. (Doc. 15 at MEC0172). The matter was also referred to Dr. Martin for external review. He found that Dr. Emlich's decision to conduct a full colonoscopy on a patient with Clostridium difficile colitis was "ill-advised" and posed a "high risk of perforation" of the colon. (Id. at MEC0399-400). Dr. Martin concluded that Dr. Emlich's decision was inappropriate, deviated from generally accepted standards of care and resulted in perforation and the need for surgical repair to the colon. (Id.).

Along with the concerns relating to the quality of care provided by Dr. Emlich, numerous concerns were raised in 2011 and 2012 regarding his professional conduct. These included several

---

[2] The CQC was responsible for evaluating the quality of care provided by a physician, whereas under the Hospital's bylaws the MEC decided whether the physician should be able to continue practicing at the Hospital. (Doc. 13-2 at 179).

instances in which he failed to timely respond to his pager, to see his patients on daily hospital rounds, to enter daily progress notes on his patients and to properly communicate with staff and patients. (Doc. 15 at MEC0558, 562, 577; at MEC0564-65, 571-72; at MEC0440-43, 445-48, 582; at MEC0434-36, 551-52, 560-61, 581).

### B. The Administrative Process

#### 1. The *Ad Hoc* Committee and the MEC

The MEC established an *ad hoc* committee ("AHC") to investigate the quality of care and professional conduct issues that had been raised as to Dr. Emlich. The MEC appointed three members to the AHC: defendant Robert A. Lowe, M.D. (the chair of the AHC and an emergency medicine physician at the Hospital); defendant Thomas E. Wanko, D.O. (an internal medicine physician at the Hospital); and defendant Gregory D. Gibbons, M.D. (a gastroenterologist at Riverside Methodist Hospital, which operates in the OhioHealth system). The AHC conducted its investigation over the course of two months and interviewed eight individuals, including Dr. Emlich, and reviewed several hundred pages of documents, including Dr. Martin's reports. The AHC gave Dr. Emlich an opportunity to dispute the findings of the external reviews and respond to the professional conduct concerns.

The AHC submitted a written report on December 4, 2012. The AHC found that the quality of care concerns were substantiated and serious, and it found Dr. Emlich's explanations or responses to the concerns to be unpersuasive. In particular, the AHC found in the fourth external review cases that Dr. Emlich's diagnoses were incorrect and that his use of TPN was not appropriate. (Doc. 15 at MEC0150-51). In the fifth external review case, the AHC similarly had "serious concerns" over his decision to perform a colonoscopy and with his failure to provide post-procedure care. (Id. at MEC0151). The AHC concluded that "Dr. Emlich has had a history of quality of care problems that have not improved over time despite numerous attempts at remediation. The clinical care concerns reflect serious deficiencies with respect to patient diagnoses, treatment options, and management. As a gastroenterologist, Dr. Emlich's pre-procedure judgment and decisionmaking is severely lacking, his procedural skills are not acceptable, and his post-procedure follow up is markedly deficient." (Id. at MEC0155).

With respect to professional conduct, the AHC found that Dr. Emlich had "a history of haphazard coverage arrangements," resulting in other physicians "having to step in to care for his patients," as well as a "history of failing to respond to pages and otherwise being unavailable when efforts are made to contact him." (Doc. 15 at MEC0152-53). The AHC also found nine

documented cases in the prior eighteen month period in which Dr. Emlich failed to see his patients or failed to see them in a timely manner. (Id. at MEC0151-52). In addition, the AHC determined that Dr. Emlich had "a history of professional behavior problems with respect to his communications with staff . . . and interactions with others." (Id. at MEC0155). It further found that Dr. Emlich violated Hospital regulations "on a number of occasions with respect to his failure to appropriately document seeing patients." (Id.).

The AHC found that Dr. Emlich's explanations regarding these quality of care and professional behavior concerns were neither persuasive nor credible and that his "recollection of events is often at direct odds with what has actually occurred." (Doc. 15 at MEC0156). It determined that "Dr. Emlich refuses to take any responsibility for any of the past issues that have occurred and consistently blames others." (Id.). And the AHC concluded that "the information before the Committee establishes an ongoing pattern of clinical concerns related to patient management and care, an ongoing pattern of communication and interaction issues that have adversely affected patient care, and an ongoing pattern of questionable credibility. In combination, these issues create clinical care and professional behavior concerns that are intertwined, pervasive, and not subject to remediation." (Id.). The AHC recommended that "Dr. Emlich's appointment and clinical privileges at the Hospital be terminated." (Id.).

The MEC convened a meeting on December 5, 2012 upon receiving the AHC's report and recommendation. At the December 5 meeting, the documents that the AHC reviewed were made available to the MEC and the members of the AHC were available for questioning. (Doc. 13-2 at 196). The MEC discussed the findings of the report with the members of the AHC and asked a number of questions of them. The questions confirmed that Dr. Emlich had provided rebuttals to the external reviews but that the AHC were in agreement with the findings of the external reviews, and they confirmed that the AHC's recommendation to terminate Dr. Emlich's privileges was unanimous. (Doc. 15 at MEC0179). After excusing the members of the AHC from the meeting, the MEC further discussed the matter and unanimously voted to accept the AHC's recommendation that Dr. Emlich's appointment and privileges be terminated. (Id. at MEC0179-80).

Dr. Emlich was given written notice on December 7, 2012 of the MEC's adverse recommendation and the reasons for the recommendation. (Doc. 15 at MEC0181-82). Through legal counsel, Dr. Emlich requested a fair hearing under the Hospital's Fair Hearing Policy for medical staff.

### 2.    The Fair Hearing and Report and Recommendation

The fair hearing took place over the course of six days between April 5, 2013 and June 5, 2013 before hearing officer William N. Copeland, Esq., who was selected by the MEC pursuant to the Fair Hearing Policy.  Dr. Emlich lodged no objection to Mr. Copeland's appointment.  (Doc. 15 at MEC0723-24).  Prior to the hearing, the MEC provided Dr. Emlich with a list of witnesses and exhibits it planned to use at the hearing.  (Id. at MEC0639, 0743-44).

At the hearing, Dr. Emlich was represented by legal counsel and called nine witnesses, including himself, to testify.  His counsel was permitted to cross-examine the witnesses called by the MEC and to submit exhibits into evidence.  Following the hearing, a transcript of the proceedings was made available to Dr. Emlich, and both parties filed post-hearing briefs with the hearing officer. (Doc. 15-2 at PSTHRG0001, PSTHRG0035).

The hearing officer issued a 52-page report in which he recommended "approval of the recommendation by the [MEC] to immediately terminate Dr. Emlich's medical staff appointment and hospital privileges at Doctor's Hospital."  (Doc. 15-2 at PSTHRG0121).  The issue before hearing officer, pursuant to the Fair Hearing Policy, was whether the MEC's adverse action was "supported by a substantial factual basis" or whether the "basis or the conclusions drawn thereon [were] either arbitrary, unreasonable or capricious."  (Id. at PSTHRG0078).  The hearing officer explained that in making that determination, he looked to the standard for immunity set forth in the Health Care Quality Improvement Act of 1986, which the Hospital bylaws referenced as a guidepost for the hearing.  (Id. at PSTHRG0090).  The elements of the immunity standard are whether the adverse action was taken: (1) in the reasonable belief that it was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts, (3) after adequate notice and fair hearing procedures were afforded to the physician, and (4) in the reasonable belief that the action was warranted by the facts.  (Id. (citing 42 U.S.C. §11112(a)).  In keeping with the Act, the hearing officer presumed that those elements were satisfied unless Dr. Emlich proved otherwise by a preponderance of the evidence.  (Id. at PSTHRG0093; 42 U.S.C. §11112(a)).

In his report, the hearing officer thoroughly discussed the evidence and testimony.  He also directly addressed Dr. Emlich's objections to the external reviews and the AHC's report, as well as his arguments that the Hospital was biased and had a vendetta against him.  In particular, Dr. Emlich had argued that starting in 2004 he made two enemies at the Hospital (Dr. Francis Dono and Dr. Dean Colwell, both of whom served in the role of vice president of medical affairs) when he opposed the Hospital's decision to implement what is known as a "closed-model" intensive care

6

unit[3] and when he reported Dr. Colwell for suspected overbilling practices.  According to Dr. Emlich, the Hospital's administration engaged in an effort to discredit and intimidate him and caused the AHC and MEC to be biased against him.

As to the first element under the HCQIA, the hearing officer found that the evidence and testimony demonstrated that the MEC acted with a reasonable belief that their action "would restrict incompetent behavior" and "protect patients." (Doc. 15-2 at PSTHRG0092.  He found that the external reviews and the AHC's report established a substantial factual basis for the quality of care and professional behavior concerns raised against Dr. Emlich.  (Id. at PSTHRG0085-89).  And he found to be persuasive the testimony from members of the MEC regarding their concern that the quality of care and professional behavior issues had been going on for years and, despite the concerns being raised to Dr. Emlich, there was not improvement – "The MEC was concerned that Dr. Emlich was a potential harm [to] patients. . . . it goes to the litany of disruptive behavior issues and the four possibly preventable deaths that had occurred."  (Id. at PSTHRG0092 (internal quotation marks omitted)).  The hearing officer found that "[p]atient care was the primary focus of the MEC" and he found no evidence to support Dr. Emlich's theory that the Hospital was acting on a vendetta against him.  (Id. at PSTHRG0093) ('[T]he action was not taken in response to an effort by OhioHealth administration to remove Dr. Emlich from the medical staff.").  He concluded, "I find nothing in the record of the Hearing that persuades me that the members of the MEC, with the information available to them at the time they took the action to terminate Dr. Emlich's privileges, did not reasonably believe that their action would restrict incompetent behavior or would protect patients." (Id.).

With respect to the second element (a reasonable effort to obtain the facts), the hearing officer observed that the MEC had the benefit of the five external review reports that had already been prepared.  He noted that four different external reviewers each had found "problems with Dr. Emlich's care." (Doc. 15-2 at PSTHRG0096.  He further noted that the MEC appointed the AHC, which met five times, conducted interviews of eight individuals and gathered hundreds of pages of records.  The hearing officer then returned to Dr. Emlich's argument that certain individuals in the Hospital's administration had a vendetta against him and influenced the AHC.  After examining the testimony of numerous witnesses, including the testimony of the members of the AHC, he found no evidence that members of the Hospital's administration influenced or steered the AHC.  The

---

[3] Under a closed-model, the intensive care physician, rather than the admitting physician, becomes the primary decision maker.  (Doc. 15-2 at PSTHRG0115).

hearing officer concluded that the AHC had objectively sought to gather different viewpoints, including that of Dr. Emlich, so they "could balance the weight of all opinions." (Id. at PSTHRG0099).

The hearing officer also addressed alleged shortcomings in the AHC's gathering of facts. Dr. Emlich argued that if the AHC had obtained additional facts, those facts would have supported his case. However, the hearing officer found that the evidence offered by Dr. Emlich in this regard was unpersuasive. For instance, the hearing officer noted that one of Dr. Emlich's witnesses, Dr. Douglas Rex (who testified in support of the appropriateness of Dr. Emlich's decision to perform a colonoscopy on the patient who was the subject of the fifth external review), admitted that the risk of a perforation is substantially increased when performing a colonoscopy on a patient with a sick colon and Dr. Rex "would not confirm whether he would have performed the colonoscopy." (Doc. 15-2 at PSTHRG0103). The hearing officer likewise found that Dr. Emlich's testimony concerning the professional behavior concerns was unpersuasive and amounted to shifting the blame for his own failings. (Id. at PSTHRG0110). The hearing officer further found that the evidence before him aligned with the evidence that the AHC had submitted to the MEC and supported the conclusions reached by the AHC. The hearing officer concluded, "I find that it has been amply demonstrated that the AHC did a thorough and comprehensive investigation into the allegations that are the basis of the MEC's action in this matter. Therefore, I find that the MEC did not act until after undertaking a reasonable effort to obtain the facts." (Id. at PSTHRG0111).

Turning to the third element (adequate notice and a fair hearing), the hearing officer noted that there was "no testimony during the Hearing, or any direct allegation, that any of Dr. Emlich's due process or procedural rights had been abridged." (Doc. 15-2 at PSTHRG0112). The hearing officer then addressed the claim made in Dr. Emlich's post-hearing brief that, at the prompting of Dr. Dono and Dr. Colwell, the Hospital's administration caused the AHC and MEC to be biased against him. The hearing officer found that Dr. Emlich's claims were unsubstantiated, noting that Dr. Dono had retired seven years before the MEC initiated any investigation against Dr. Emlich. (Id. at PSTHRG0113). The hearing officer further noted that Dr. Colwell, who had retired in 2012 prior to the MEC's vote to recommend terminating Dr. Emlich's privileges, was not involved with the investigation and did not attempt to influence the MEC. (Id. at PSTHRG0114). And he further observed that there was no evidence that the Hospital influenced or steered Dr. Martin, who authored the fourth and fifth external reviews, which gave rise to the MEC's decision to authorize an investigation by the AHC. (Id.).

8

Finally, as to the fourth element (a reasonable belief that the action was warranted by the facts), the hearing officer briefly stated that, in light of his extensive discussion of the first three factors, he found that the MEC "had a substantial factual basis for making its recommendation and that that basis, and/or the conclusions drawn thereon, were not unreasonable, arbitrary or capricious." (Doc. 15-2 at PSTHRG0120).

The hearing officer therefore recommended approval of the MEC's December 5, 2012 recommendation to immediately terminate Dr. Emlich's privileges at the Hospital. (Doc. 15-2 at PSTHRG0121).

### 3.      The Termination of Dr. Emlich's Privileges

The hearing officer's report and recommendation was provided to all of the members of the MEC, and the MEC reconvened on August 14, 2013. (Doc. 15-2 at PSTHRG0127). After a discussion of the report, the MEC voted unanimously to reaffirm its original recommendation that Dr. Emlich's privileges be terminated. (Id.)

On August 22, 2013, the Hospital provided Dr. Emlich with a notice of the MEC's final adverse recommendation. (Doc. 15-2 at PSTHRG0128). The notice advised him of his right to request appellate review by the Board of Directors. Dr. Emlich timely requested such review, and he and the MEC were invited to submit written briefs, which they did. (Id. at PSTHRG0132-54). Upon considering the written briefs, the hearing officer's report and recommendation and the administrative record, the Board affirmed the MEC's recommendation and terminated Dr. Emlich's privileges at the Hospital effective September 25, 2013. The Board found that "substantial, credible evidence" regarding Dr. Emlich's clinical practices and professional behavior "justified" the termination of his privileges. (Id. at PSTHRG0155). The Board also found that Dr. Emlich had been given ample opportunity to present evidence in support of his case and that he had failed to demonstrate that he was not provided with a fair hearing. (Id.) Shortly thereafter, OhioHealth informed Dr. Emlich that his privileges were automatically terminated at OhioHealth's other hospitals because the adverse action was based on deficiencies of clinical care. (Id. at PSTHRG0157).

### C.      The Complaint in this Suit

In his complaint, Dr. Emlich alleges that the termination of his privileges had its origins in his disagreement in 2004 with the Hospital's decision to implement a closed-model for the intensive care unit. He alleges that he was the primary spokesperson against the decision and that his stance pitted him against both Dr. Dono, who the vice president of medical affairs at the time, and his

9

successor, Dr. Colwell. The complaint further alleges that the first quality of care concern, which arose in 2004, was based on unfounded claims and was an attempt by the Hospital to intimidate Dr. Emlich because of his opposition to the closed-model ICU. In September 2005, Dr. Emlich reported Dr. Dono to the State Medical Board of Ohio for allegedly using the peer review process to intimidate him.

The complaint next alleges that the quality of care concerns which arose in 2006 and 2007 were a continuation of the Hospital's effort to intimidate him. According to the complaint, in 2007 the State Medical Board informed Dr. Emlich that his report against Dr. Dono did not warrant the initiation of formal disciplinary charges.

The complaint alleges that beginning in 2009 Dr. Emlich voiced his opposition to what he considered to be fraudulent billing practices at the Hospital. Dr. Emlich confronted Dr. Colwell about systematic overbilling at the Hospital and told Dr. Colwell that he would not perform procedures at overly elevated costs.

According to the complaint, the quality of care concerns that arose in 2012 represented an extension of the effort to intimidate Dr. Emlich. The complaint alleges that the AHC contained members who were competitors of Dr. Emlich and that it reached a decision without having the full records. The complaint further alleges that the hearing officer conducted an "incomplete and biased investigation" and reached an "arbitrary" and "unreasonable" decision. (Doc. 1 at ¶ 36).

The complaint asserts seven causes of action, including two federal claims. The complaint alleges that defendants have combined to limit Dr. Emlich's trade as a physician by terminating his privileges at all OhioHealth hospitals, in violation of the Sherman Act, 15 U.S.C. §§ 1, 2. OhioHealth has allegedly perpetuated "a scheme to monopolize the health care system in Ohio" by "rid[ding] their entities of independent physicians and/or competitors." (Doc. 1 at ¶ 37). OhioHealth was allegedly able to effectuate its scheme by improperly subjecting Dr. Emlich to the peer review process.

The complaint also asserts a claim under the False Claims Act, 31 U.S.C. § 3730, and alleges that defendants conspired to terminate his privileges after his repeated attempts to "stifle fraudulent billing practices that Defendants required him, and other similarly situated physicians, to engage in." (Id. at ¶ 45). In addition, the complaint asserts state law claims for tortious interference with a

business relationship, intentional infliction of emotional distress, civil conspiracy, defamation and due process.[4]

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the

---

[4]  The due process claim is not brought under 42 U.S.C. § 1983, nor does it allege any wrongdoing by a state actor.

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.  Discussion

Defendants move for summary judgment on the issue of whether they are immune from damages under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101, *et seq.*  The HCQIA was passed in order to "provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities." Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 467 (6th Cir. 2003); see also Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1148 (8th Cir. 1998) (noting that the HCQIA serves to "improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior") (internal quotation marks omitted).

The HCQIA provides immunity from damages for a "professional review action" taken by a "professional review body" if certain criteria for reasonableness are satisfied.  42 U.S.C. § 11111(a). A "professional review action" is defined as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician."  42 U.S.C. § 11151(9).  A "professional review body" means "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity."  42 U.S.C. § 11151(11).  It is undisputed that this lawsuit concerns a professional review action taken by a professional review body, the MEC.

The grant of immunity applies when the professional review action by the professional review body is taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. §§ 11111(a)(1) & 11112(a).

A presumption applies that these elements have been satisfied and immunity will be granted unless the presumption is rebutted by a preponderance of the evidence.  42 U.S.C. § 11112(a); Meyers, 341 F.3d at 467-68.  "[T]his rebuttable presumption 'creates an unusual summary judgment standard' that can be stated as follows: 'Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?'"  Meyers, 341 F.3d at 468 (quoting Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994)).  "In a sense, the presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable."  Bryan, 33 F.3d at 1333 (emphasis in original).

Because the elements incorporate a reasonableness standard, the district court's inquiry is not whether a professional review body reached the right conclusion; it is whether the review body's beliefs and efforts were reasonable.  Reyes v. Wilson Mem'l Hosp., 102 F. Supp. 2d 798, 815 (S.D. Ohio 1998); see also Johnson v. Spohn, 334 Fed. App'x 673, 680 (5th Cir. 2009) (holding that a court's "role is not to second-guess the merits of the MEC's decision, but rather to consider whether the procedures afforded were fair and whether the members of the MEC made a reasonable investigation and a reasonable decision based on the facts before them").

The reasonableness standard is an objective one.  Meyers, 341 F.3d at 468; Wayne, 140 F.3d at 1148.  As such, the court's primary focus is on the sufficiency of the basis for the review body's action rather than any alleged bad faith, hostility or personal animosity on the part of the members of the review body.  Bryan, 33 F.3d at 1335; Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992).

## A.    Reasonable Belief that the Action Furthered Quality Health Care

The first element is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients."  Meyers, 341 F.3d at 468 (internal quotation marks omitted).  The action need not "result in actual improvement in the quality of health care" – the HCQIA instead requires that the action "was undertaken in the reasonable belief

that quality health care was being furthered." Id. at 468; see also Badri v. Huron Hosp., 691 F.Supp.2d 744, 765 (N.D. Ohio 2010) ("The professional review need not result in the actual furtherance of the quality of health care so long as it was undertaken with a reasonable belief that such improvement would result.").

"Quality health care" refers to not only limiting "clinical incompetence" but also "includes matters of general behavior and ethical conduct." Meyers, 341 F.3d at 469 (citing Bryan, 33 F.3d at 1334-35); see also Everhart v. Jefferson Parish Hosp. Dist. No. 2, 757 F.2d 1567, 1573 (5th Cir. 1985) ("'[Q]uality patient care demands that doctors possess at least a reasonable ability to work with others.") (internal quotation marks omitted). Thus, courts have held that the first element is satisfied where a professional review body has grounds to believe that a physician: threw "temper tantrums" during surgery, had a history of failing to timely complete medical records and failed to provide coverage for patients while he was out of town, see Meyers, 341 F.3d at 464, 469; engaged in harassing, abusive or disruptive conduct toward staff or patients, see Bryan, 33 F.3d at 1326, 1335, and Badri, 691 F.Supp.2d 751, 766; made misrepresentations to hospital administration about his practice and privileges at another hospital and lied about the number of malpractice actions brought against him, see Talwar v. Mercer Cty. Joint Twp. Cmty. Hosp., 520 F.Supp.2d 894, 900 (N.D. Ohio 2007); or improperly removed and manipulated medical records, see Wayne, 140 F.3d at 1147.

Here, the court readily concludes that the MEC had a reasonable belief that terminating Dr. Emlich's privileges would further quality health care. The record establishes that the concerns about Dr. Emlich were twofold: clinical incompetence and unprofessional behavior. As to the clinical care concerns, five separate external reviews, involving six different patients, documented numerous deficiencies in Dr. Emlich's provision of care (with multiple failings found within each review). These deficiencies included making incorrect diagnoses, recommending sub-optimal courses of treatment, performing risky and ill-advised procedures, performing a procedure on an unstable patient outside of the ICU and failing to make appropriate intra-procedure identifications. In each case, the external reviewer found that Dr. Emlich's provision of care fell below accepted standards and contributed to preventable and significant harm to the patient, including several deaths, internal bleeding, poor nutrition and protracted hospital stays to address the complications resulting from Dr. Emlich's actions.

The external reviews also chronicled Dr. Emlich's failings in an area that encompassed both clinical competency and professional behavior concerns. The first, second, third and fourth external reviews found that Dr. Emlich had failed to maintain adequate documentation of the basis for his

14

diagnoses, courses of treatment and the procedures he performed.  (Doc. 15 at MEC0189, 191, 297-99, 303, 329-30, 344-46, 355).  For example, the third review found that there was "missing information" about the patient's symptoms and that Dr. Emlich's "evaluation and history documentation" for the patient was "incomplete and brief."  (Id. at MEC0329).  In addition to being a routine job responsibility, the creation and keeping of proper records is "mandatory for optimal patient care" (id. at MEC0303), and Dr. Emlich's deficiencies in this regard implicated quality of care concerns.  (Id. at MEC0304 (noting that poor documentation cast doubt on whether Dr. Emlich had "adequate knowledge regarding all ERCP related complications, detection and treatment of pancreatitis and retroperitoneal perforation"); (id. at MEC0344 ("There is no documented deductive reasoning in attempting to define more precisely the source of the patient's pain and to prevent recurrent episodes which this patient clearly had."); (id. at MEC0353 (noting that a lack of documentation of what Dr. Emlich discussed with the patient left unclear whether the patient was adequately informed of different treatment options)).

As to the professional behavior concerns, the record again chronicles numerous and repeated problems.  For instance, medical staff were unable to reach Dr. Emlich on at least three occasions from mid-April to June 1, 2012, despite superiors having met with Dr. Emlich in 2011 about the issue of him not responding to his pager, (doc. 15 at MEC0558).  See Johnson, 334 Fed. App'x at 680 (holding that discipline of physician who had, among other things, "been inaccessible to nursing staff," was in reasonable belief that the action furthered quality health care).  In the same time frame, Dr. Emlich failed three times to see patients on his daily rounds and, on one of those instances, charted a note "as if he had actually seen the patient which he admitted to [a nurse] he did not."  (Doc. 15 at MEC0565).  Moreover, the record showed that Dr. Emlich failed numerous times in 2011 and 2012 to enter daily progress notes and that, from April to September 2012, he had several communications issues with staff.

The reports documenting Dr. Emlich's numerous deficiencies went through two rounds of review and additional fact-finding prior to the MEC making its final recommendation to terminate Dr. Emlich's privileges.  First, the AHC's investigation substantiated both the quality of care and the professional behavior concerns.  Second, the hearing officer, after hearing six days of witness testimony and considering the entire record, found that both categories of concerns about Dr. Emlich's practice had a substantial basis in fact.  Further, these rounds of fact-finding demonstrated that the professional behavior issues were more extensive than what the raw documentation discussed above indicated.  (Doc. 15-2 at PSHRG0105-09 (hearing officer recounting the witness

testimony on behavioral issues, including that many of the issues had persisted for years)). And the AHC's and hearing officer's reviews also established that Dr. Emlich had an attitude of stridently refusing to take responsibility for his actions. (Id. at PSTHRG0109-11 ("At the Hearing, the testimony and evidence demonstrated that Dr. Emlich blames others and fails to recognize his own failures."). This attitude, coupled with persistent and substantial deficiencies in Dr. Emlich's quality of care and professional behavior, provided a sufficient basis to support the reasonableness of the MEC's belief that terminating Dr. Emlich's privileges would restrict incompetent behavior and protect patients.

In his response to defendants' motion for summary judgment, plaintiff falls well short of rebutting the presumption that the first element of the HCQIA has been satisfied. Plaintiff offers a purported "expert opinion" in the form of an affidavit of an attorney, Richard Schmidt, Jr., who is employed as general counsel for a hospital in Kenosha, Wisconsin. Mr. Schmidt asserts, without explanation or detail, that based on his review of the record and his experience drafting medical bylaws, it is his opinion that a "jury could reasonably believe that the action [of the MEC] was not taken in furtherance of quality health care, but in furtherance of defendants' own agendas." (Doc. 23-1 at ¶ 11.a). Mr. Schmidt's assertion is an unsupported legal conclusion that must be disregarded.[5] See Fed. R. Civ. P. 56(c)(4); F.R.C. Int'l, Inc. v. United States, 278 F.3d 641, 643 (6th Cir. 2002) ("It is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits . . . .").

Plaintiff next argues that he was a "target" because of the conflicts he had with Dr. Dono and Dr. Colwell about the closed-model ICU and alleged overbilling practices. This argument remains, as it was before the hearing officer and the MEC, pure speculation. Plaintiff points to a 2004 email sent by Dr. Dono to another doctor wherein Dr. Dono stated that he "never had any respect" for Dr. Emlich and considered him to be "incompetent" to treat patients in the critical care unit. (Doc. 13-4 at 1206, 1209). Plaintiff speculates that Dr. Dono's hostility towards him triggered the 2004, 2006 and 2007 external reviews. Even if this unsupported claim were true, there is no evidence that the individuals who performed the external reviews were influenced in any way by Dr. Dono. They made objective, substantiated findings that the care provided by Dr. Emlich was sub-standard. Nor does plaintiff's claim address the fact that Dr. Dono retired long before the MEC initiated any investigation against Dr. Emlich. The evidence regarding Dr. Emlich's failings in 2011

---

[5] Mr. Schmidt makes similar unsupported legal conclusions regarding the other three HCQIA elements, and these must be disregarded as well.

and 2012 alone would provide a sufficient basis for the MEC's belief that it should take action against him to restrict incompetent behavior and protect patients.

Plaintiff asserts that Dr. Colwell too harbored animosity against him. After hearing witness testimony, the hearing officer found that "Dr. Colwell and Dr. Emlich did not like each other." (Doc. 15-2 at PSTHRG0119). However, he also found that there was no evidence "to show that Dr. Colwell was even aware that Dr. Emlich had filed [ ] a report" regarding alleged overbilling practices.[6] (Id. at PSTHRG0115). In short, the hearing officer found that "Dr. Emlich failed to produce any proof to support" his assertion that the external reviews and subsequent investigations were pretext for a scheme to target and oust Dr. Emlich. (Id. at PSTHRG0113). Indeed, when asked on the witness stand whether he had evidence of such a scheme, "Dr. Emlich admitted that he did not have any proof of this 'conspiracy.'" (Id.).

In his response brief, plaintiff again fails to submit evidence supporting the existence of a scheme by Dr. Colwell to oust him. He cites the fair hearing testimony of two physicians who claimed, like he did, that Dr. Colwell disliked them and subjected them to extra scrutiny. But there is no evidence that Dr. Colwell caused the 2012 external reviews of Dr. Emlich to occur or caused the complaints regarding his professional conduct to be made. Nor is there any evidence that he influenced the external reviews or the AHC investigation, much less influenced the MEC. And, again, even if Dr. Colwell's personal animosity toward Dr. Emlich did prompt extra scrutiny of Dr. Emlich's practice, the reviews of Dr. Emlich legitimately discovered numerous deficiencies in the quality of his care and in his professional behavior, and these deficiencies were verified by both the AHC and the hearing officer before the MEC made its final recommendation. See Bryan, 33 F.3d at 1335 (holding that assertions of "personal animosity" and "hostility" are "irrelevant to the reasonableness standards" of the HCQIA); Austin, 979 F.2d at 734 ("Austin's assertions of hostility do not support his position because they are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the defendants' actions."); Reyes, 102 F. Supp. 2d at 811 ("The courts which have addressed the issue of immunity under the HCQIA have been unanimous in holding that a plaintiff cannot prove the 'unreasonableness' of a defendant's actions by introducing evidence suggesting that a defendant acted in 'bad faith.'").

---

[6] It is unclear to whom Dr. Emlich filed a report in 2009. Plaintiff's response brief indicates that the report was filed with the "Inspector General" (presumably meaning the Inspector General for the State of Ohio), but there is no evidence to confirm that a report was filed with that office.

**B.      Reasonable Effort to Obtain Facts**

The HCQIA presumes that a professional review body has made "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2).  In reviewing whether a plaintiff is able to rebut that presumption at the summary judgment stage, a court should consider whether "the totality of the process leading up to the professional review action evinced a reasonable effort to obtain the facts of the matter."  Meyers, 341 F.3d at 469 (internal quotation marks omitted).  The HCQIA does not require that the fact-finding effort be perfect or exhaustive.  See Badri, 691 F. Supp.2d at 766.

An effort to obtain the facts typically is reasonable where the process has these characteristics: information has been gathered from individuals with firsthand knowledge; the physician at issue has been allowed to tell his version of events and to make a record; and several layers of review have been conducted by different bodies.  See, e.g., Meyers, 341 F.3d at 469; Bryan, 33 F.3d at 1335; Johnson, 334 Fed. App'x at 680-81; Badri, 691 F.Supp.2d at 766.  Each of these indicia of a reasonable effort to obtain facts is present in this case.  In addition to the contemporaneous external reviews that were performed when quality of care concerns were raised about Dr. Emlich, the AHC conducted a comprehensive investigation in which it gathered documents and interviewed many individuals.  Notably, the AHC interviewed Dr. Emlich and invited him to respond to the particular concerns that had been raised regarding his practice.  The MEC, once it received the AHC's report and recommendation questioned the AHC about the report and specifically inquired about Dr. Emlich's responses to the complaints against him.  At the fair hearing, Dr. Emlich was represented by legal counsel and was allowed to call nine witnesses, cross-examine the witnesses called by the MEC and to submit exhibits into evidence.  The hearing officer made an extensive record of his findings and conclusions, which also was received by the MEC before it made its final recommendation.

Plaintiff is unable to rebut the presumption that a reasonable effort was made to obtain the facts.  He largely finds fault with how the matters were initially handled at the time certain concerns arose, such as a perceived inability on his part to supply information and an alleged inability to provide expert testimony to the individuals who conducted external reviews.  But these claims ignore that, whatever limitations may have existed at the time of initial fact-finding, Dr. Emlich had a full opportunity to present his case to the AHC, the hearing officer and the MEC.

The remainder of plaintiff's arguments amount to his mere disagreement with how the evidence was viewed and with the findings that were reached, accompanied by his conclusory

assertions about the hostility which certain individuals had against him.  As explained above, there is no evidence that Dr. Dono or Dr. Colwell initiated a scheme to oust him.  And even if they did, the AHC and hearing officer conducted thorough and comprehensive investigations that allowed Dr. Emlich to fully present testimony and evidence in his defense.  Plaintiff's disagreement with the result does not rebut the presumption that the effort to obtain facts was reasonable.  See Moore v. John Deere Health Care Plan, Inc., 492 Fed. App'x 632, 639 (6th Cir. 2012).

### C.      Fair and Adequate Notice and Hearing

The third element for HCQIA immunity is met when the physician is afforded adequate notice and hearing procedures that are fair under the circumstances.  42 U.S.C. § 11112(a)(3).  The HCQIA establishes a "safe harbor" whereby the requirements of § 11112(a)(3) are deemed to be satisfied.  As summarized by the Sixth Circuit, the statutory safe harbor provision applies when:

> 1. The physician has been given notice stating that a professional review action has been proposed to be taken against the physician, reasons for the proposed action, that the physician has the right to request a hearing on the proposed action, any time limit (of not less than 30 days) within which to request such a hearing, and a summary of the rights in the hearing. . . .
>
> 2. If a hearing is requested on a timely basis . . ., the physician involved must be given notice stating the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
>
> 3. If a hearing is requested on a timely basis . . ., the hearing shall be held (as determined by the health care entity) before an arbitrator mutually acceptable to the physician and the health care entity, before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved.
>
> 4. [I]n the hearing the physician involved has the right to representation by an attorney or other person of the physician's choice, to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof, to call, examine, and cross-examine witnesses, to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and to submit a written statement at the close of the hearing; and upon completion of the hearing, the physician involved has the right to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and to receive a written decision of the health care entity, including a statement of the basis for the decision.

Meyers, 341 F.3d at 470-71 (6th Cir. 2003) (footnote omitted) (citing 42 U.S.C. § 11112(b)).

Defendants have established that they fully complied with the safe harbor requirements. They are therefore deemed to have conclusively provided Dr. Emlich with fair and adequate notice and hearing procedures.  See Meyers, 341 F.3d at 470-71; Bryan, 33 F.3d at 1336; Johnson, 334 Fed. App'x at 681; Badri, 691 F.Supp.2d at 767; Talwar, 520 F.Supp.2d at 903.

Plaintiff has not genuinely disputed that the safe harbor requirements have been satisfied. But one of his repeated claims does deserve to be addressed.  Plaintiff argues that two members of the AHC, Dr. Gibbons and Dr. Wanko, were direct competitors of his and that they were biased against him.  This contention is unavailing for two reasons.  First, the safe harbor provision requires only that the hearing officer not be in direct economic competition with the physician at issue.  42 U.S.C. § 11112(b)(3)(A)(ii).  Dr. Gibbons and Dr. Wanko did not act as hearing officers; the hearing officer in this case was an attorney.  See Wayne, 140 F.3d at 1149 (holding that presumption of fairness is not rebutted by showing that direct competitors participated in the peer review process, so long as they did not serve as a hearing officer).  Second, like his allegations of animosity, plaintiff's allegations of bias are mere speculation.  As such, plaintiff has failed to submit evidence from which a reasonable jury could find by a preponderance of the evidence that he did not receive fair and adequate hearing procedures.

### D.    Reasonable Belief that Action was Warranted by the Facts

The final element of immunity "closely tracks" the analysis of the first element.  Meyers, 341 F.3d at 471 (citing cases).  The role of a federal court "is not to substitute [its] judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges."  Bryan, 33 F.3d at 1337 (internal quotation marks omitted); see also Johnson, 334 Fed. App'x at 684 ("[W]e will not substitute our own judgment for that of Dr. Johnson's colleagues, who are much more qualified to make decisions regarding the adequacy of medical treatment and professional competency.").  Thus, plaintiff must do more than show that an incorrect conclusion was reached; he must show that "the facts were so obviously mistaken or inadequate as to make reliance on them unreasonable."  Meyers, 341 F.3d at 471 (internal quotation marks omitted).

As stated above, the record establishes that the MEC had more than a sufficient factual basis to take action against Dr. Emlich.  Its decision to recommend terminating Dr. Emlich's privileges was warranted in light of the persistent deficiencies in his quality of care (deficiencies for which all of the reviewing entities found to have contributed to preventable and significant harm to patients), his unprofessional behavior and his refusal to accept responsibility for his actions.

### E.    Summary

For the reasons stated above, plaintiff has failed to meet his burden of showing at the summary judgment stage that a reasonable jury, viewing the facts in a light most favorable to plaintiff, could conclude that he has shown by a preponderance of the evidence that defendants' actions are outside the scope of § 11112(a).

## IV.    False Claims Act

The complaint asserts a claim under the False Claims Act, 31 U.S.C. § 3730.  Plaintiff alleges that defendants conspired to terminate his privileges after he attempted to alert authorities of fraudulent billing practices.

The court *sua sponte* notes that plaintiff has not alleged that he has complied with any of the procedural prerequisites for bringing a claim under the FCA.  See 31 U.S.C. §3730(b) (requiring, among other things, that the claim be brought in the name of the United States Government, that a copy of the complaint and disclosure of all material evidence be served on the Government and that the complaint be filed *in camera*).  Nor does the complaint appear to plead the alleged fraudulent practices with particularity.  See Chesbrough v. VPA, P.C., 655 F.3d 461, 466 (6th Cir. 2011) (holding that claim under the FCA must plead fraud with particularity).

Accordingly, plaintiff is **ordered to show cause** within 30 days of the date of this order why his FCA claim should not be dismissed.  Defendants may file a reply within 21 days of plaintiff's filing of a response to the show cause order.

## V.    Conclusion

For the reasons stated above, defendants' motion for summary judgment on the issue of immunity from damages under the HCQIA (doc. 19) is **GRANTED.**

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 22, 2016