IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

William F. Emlich, Jr., D.O., et al.,

    Plaintiffs,

v.

OhioHealth Corp., et al.,

    Defendants.

Case No. 2:14-cv-1697

Judge Graham

Opinion and Order

Plaintiff Dr. William F. Emlich, Jr. brings this action concerning the termination of his clinical and medical staff appointment privileges at hospitals operated by defendant OhioHealth Corporation. Also named as defendants are various medical professionals who participated in the peer review process which culminated in the termination of Dr. Emlich's privileges.

Now before the court is defendants' unopposed motion for summary judgment, which is granted for the reasons set forth below.

## I. Background

### A. The Termination of Dr. Emlich's Privileges

The court's December 22, 2016 Opinion and Order thoroughly describes the factual background of this dispute. Here, the court summarizes the relevant facts.

Dr. Emlich practiced as a gastroenterologist and in 1989 obtained privileges at Doctors Hospital in Columbus, Ohio. The Hospital later became part of the OhioHealth system.

Beginning in 2004 and continuing until 2012, a series of quality of care concerns arose regarding Dr. Emlich's practice at the Hospital. In all, five external reviews and one internal review were conducted pursuant to Hospital bylaws regarding his care of seven separate patients. All five external reviews (covering six patients) found that Dr. Emlich's care had deviated from generally accepted standards and had contributed to harm to his patients, including death in four cases. In addition to the quality of care concerns, numerous issues were raised in 2011 and 2012 regarding Dr. Emlich's professional conduct.

1

Under the Hospital's bylaws, the Medical Executive Committee ("MEC") established an *ad hoc* committee ("AHC") to investigate the quality of care and professional conduct issues concerning Dr. Emlich. The AHC conducted a two-month investigation and interviewed eight individuals, including Dr. Emlich, and reviewed several hundred pages of documents, including final reports from the external reviews. The AHC gave Dr. Emlich an opportunity to dispute the findings of the external reviews and to respond to the professional conduct concerns.

The AHC submitted a written report on December 4, 2012 finding that the quality of care concerns were substantiated: "Dr. Emlich has had a history of quality of care problems that have not improved over time despite numerous attempts at remediation. The clinical care concerns reflect serious deficiencies with respect to patient diagnoses, treatment options, and management. As a gastroenterologist, Dr. Emlich's pre-procedure judgment and decisionmaking is severely lacking, his procedural skills are not acceptable, and his post-procedure follow up is markedly deficient." (Doc. 15 at MEC0155). The AHC also found that Dr. Emlich had "a history of professional behavior problems" and had violated Hospital regulations on numerous occasions. (Id. at MEC0155). The AHC further found that "Dr. Emlich refuses to take any responsibility for any of the past issues that have occurred and consistently blames others." (Id. at MEC0156). It concluded that "the information before the Committee establishes an ongoing pattern of clinical concerns related to patient management and care, an ongoing pattern of communication and interaction issues that have adversely affected patient care, and an ongoing pattern of questionable credibility. In combination, these issues create clinical care and professional behavior concerns that are intertwined, pervasive, and not subject to remediation." (Id.). The AHC recommended that "Dr. Emlich's appointment and clinical privileges at the Hospital be terminated." (Id.).

The MEC convened a meeting at which it voted unanimously to accept the AHC's recommendation that Dr. Emlich's appointment and privileges be terminated. Dr. Emlich was given written notice of the MEC's adverse recommendation and the reasons for the recommendation. Through legal counsel, Dr. Emlich requested a fairness hearing under the Hospital's Fair Hearing Policy for medical staff.

The fairness hearing took place over the course of six days in April and June 2013 before a hearing officer selected by the MEC pursuant to the Fair Hearing Policy. Prior to the hearing, the MEC provided Dr. Emlich with a list of witnesses and exhibits it planned to use at the hearing. At the hearing, Dr. Emlich was represented by legal counsel and called nine witnesses, including himself, to testify. His counsel was permitted to cross-examine the witnesses called by the MEC and

to submit exhibits into evidence. Following the hearing, Dr. Emlich filed a post-hearing brief with the hearing officer.

The hearing officer issued a 52-page report in which he recommended "approval of the recommendation by the [MEC] to immediately terminate Dr. Emlich's medical staff appointment and hospital privileges at Doctor's Hospital." (Doc. 15-2 at PSTHRG0121). The issue before hearing officer, pursuant to the Fair Hearing Policy, was whether the MEC's adverse action was "supported by a substantial factual basis." (Id. at PSTHRG0078). In his report, the hearing officer thoroughly discussed the written evidence and the testimony. He also directly addressed Dr. Emlich's objections to the external reviews and the AHC's report, as well as his argument that the Hospital was biased against him. The hearing officer found that the MEC's adverse action was supported by a substantial factual basis and was taken with a reasonable belief that the action would restrict incompetent behavior and protect patients. The hearing officer found no support for Dr. Emlich's claim of bias or his other objections.

After receipt of the hearing officer's report, the MEC reconvened and voted unanimously to reaffirm its original recommendation that Dr. Emlich's privileges be terminated. The Hospital provided Dr. Emlich with a notice of the MEC's final adverse recommendation and of his right to appeal to the Board of Directors, which he did. Upon receiving additional written briefs, the Board affirmed the MEC's recommendation and terminated Dr. Emlich's privileges at the Hospital effective September 25, 2013. The Board found that "substantial, credible evidence" regarding Dr. Emlich's clinical practices and professional behavior "justified" the termination of his privileges. (Doc. 15-2 at PSTHRG0155). The Board also found that Dr. Emlich had been given ample opportunity to present evidence in support of his case and that he had failed to demonstrate that he was not provided with a fair hearing.

OhioHealth informed Dr. Emlich that his privileges were automatically terminated at OhioHealth's other hospitals because the adverse action was based on deficiencies of clinical care.

**B.     The Complaint**

In his complaint, Dr. Emlich alleges that the termination of his privileges was the result of an effort to retaliate against him for opposing certain policies and practices at the Hospital. Dr. Emlich alleges that he was the primary spokesperson against the Hospital's decision in 2004 to implement a closed-model for the intensive care unit and that his stance pitted him against the vice president of medical affairs. In 2009 Dr. Emlich voiced his opposition to what he considered to be fraudulent billing practices at the Hospital and confronted the vice president of medical affairs about

3

the matter. According to the complaint, the quality of care concerns brought against Dr. Emlich were unfounded and rooted in an attempt to intimidate him.

The complaint asserted seven causes of action. One of the claims, made under the False Claims Act, 31 U.S.C. § 3730, was dismissed by the court on June 13, 2017 after Dr. Emlich failed to show cause why his False Claims Act claim should not be dismissed for failing to comply with the procedural requirements for filing such a claim. See 31 U.S.C. § 3730(b).

The remaining six claims are brought under federal and state law. The complaint asserts a claim under the Sherman Act, 15 U.S.C. §§ 1, 2. The complaint alleges that OhioHealth terminated Dr. Emlich's privileges at all of its hospitals with the intent to restrain his trade as a physician.

The complaint also asserts a "due process" claim. The due process claim makes reference to the standards set forth in the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101, *et seq.*, (which are discussed in more detail below) and alleges that Dr. Emlich's due process rights were violated because defendants did not make a reasonable effort to obtain the facts and did not provide him with adequate notice and hearing procedures.

The remaining claims are brought under state law: tortious interference with a business relationship, intentional infliction of emotional distress, civil conspiracy and defamation.

### C. The Court's Ruling on Immunity from Damages.

Defendants moved for summary judgment on the issue of whether they were immune from damages under the HCQIA. On December 22, 2016, the court issued an opinion and order granting defendants' motion for summary judgment.

The HCQIA was enacted to "provide for effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in peer review activities." Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 467 (6th Cir. 2003). It provides immunity from damages for a "professional review action" taken by a "professional review body" if certain criteria for reasonableness are satisfied. 42 U.S.C. § 11111(a). Those criteria are that the professional review body act: (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts, (3) after adequate notice and hearing procedures are afforded to the physician involved, and (4) in the reasonable belief that the action was warranted by the facts. 42 U.S.C. § 11112(a).

The court found, upon review of the record of the peer review proceedings, that all four of the criteria for immunity were satisfied. The record contained extensive documentation which substantiated the quality of care and professional conduct concerns. Plaintiff offered no evidence to

support his theory that defendants were biased and attempting to retaliate against him. The court thus found that defendant acted in the reasonable belief that the termination of Dr. Emlich's privileges was in furtherance of quality health care. The court next found that defendants made a reasonable effort to obtain the facts, noting that they had obtained evidence from multiple sources, including Dr. Emlich, and from numerous individuals with firsthand knowledge and that they had subjected the information gathered to external review and cross-examination. Third, the court found that Dr. Emlich received adequate notice and hearing procedures because defendants fully complied with the HCQIA's safe harbor provision. See 42 U.S.C. § 11112(b). Finally, the court found that defendants had a reasonable belief that the facts warranted the termination of Dr. Emlich's privileges because his repeated deficiencies in care led to preventable and serious harm to his patients and because he refused to accept responsibility or correction.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379

(6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Discussion

### A. Claims that Fail under the Law of the Case Doctrine

The "law of the case" doctrine generally precludes a court from reconsidering issues decided at an earlier stage of the litigation. Hanover Ins. Co. v. Am. Eng'g Co., 105 F.3d 306, 312 (6th Cir. 1997). Thus, a decision on an issue will continue to govern in later stages of the same case unless: (1) "substantially different evidence" is presented later in the litigation; (2) "a subsequent contrary view of the law is decided by the controlling authority"; or (3) the prior decision is "clearly erroneous and would work a manifest injustice." Id.

Plaintiff, who has not opposed the present motion for summary judgment, has not presented any grounds for the court to deviate from the law of the case established by the court's decision granting the defendants immunity from damages under the HCQIA.

Application of the law of the case doctrine means that four of plaintiff's claims necessarily fail. The complaint's allegations of a due process violation track the four criteria for immunity under the HCQIA. (Doc. 1 at ¶¶ 49-52) (alleging, for instance, that defendants violated due process by not making a reasonable effort to obtain the facts). Because the court has found as a matter of law that defendants' actions satisfied the criteria of the HCQIA, plaintiff's due process claim fails.[1]

The claim for tortious interference with a business relationship also fails. One element of a claim for tortious interference is that defendant's conduct was "improper" under the circumstances.

---

[1] The court further finds that a private cause of action does not exist under the HCQIA. See e.g., Brown v. Med. Coll. of Ohio, 79 F.Supp.2d 840, 844 (N.D. Ohio 1999) ("Neither the HCQIA nor its accompanying regulations provide a private right of action.").

6

Brookeside Ambulance, Inc. v. Walker Ambulance Serv., 112 Ohio App.3d 150, 156, 678 N.E.2d 248, 252 (Ohio Ct. App. 1996). In determining whether conduct was improper, a court may consider the nature of the conduct, the actor's motive, the interests advanced by the conduct and societal interests, among other things. Id. The court has found as a matter of law that defendants terminated Dr. Emlich's privileges with the reasonable belief that their action was warranted by the facts and would further quality health care by restricting incompetent behavior and protecting patients. Thus, their action was not improper.

The claim for intentional infliction of emotional distress likewise fails. Plaintiff cannot establish the required element that defendants' conduct was "so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community." Roe v. Franklin Cnty., 109 Ohio App.3d 772, 783-84, 673 N.E.2d 172, 180 (Ohio Ct. App. 1996). Again, defendants acted with the reasonable belief that terminating Dr. Emlich's privileges would further quality health care.

Finally, the claim of a civil conspiracy fails. Such a claim requires a "malicious combination," and the "malice involved in the tort is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (Ohio 1998) (internal quotation marks omitted). Because the court has found that defendants had a reasonable basis for their action, plaintiff cannot establish the element of a malicious combination.

**B.  Sherman Act**

The complaint alleges that defendants acted to limit Dr. Emlich's trade as a physician by terminating his privileges at all of OhioHealth's hospitals. The court finds that plaintiff has not suffered an antitrust injury, which deprives him of standing under the Sherman Act, 15 U.S.C. § 1.

In order to prevail under the Sherman Act, plaintiff "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). "Individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act." Care Heating & Cooling, Inc. v. American Standard, Inc., 427 F.3d 1008, 1014 (6th Cir. 2005). Thus, an "antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996).

7

The alleged injuries in this case relate solely to the harm Dr. Emlich personally suffered from defendants' action. In support of the Sherman Act claim, the complaint alleges that defendants interfered with plaintiff's business relationships with patients, did harm to Dr. Emlich's reputation and income, and caused him severe emotional distress. (Doc. 1 at ¶¶ 70-71). The court finds that plaintiff has failed to establish any market-wide injury or any competition-reducing result of defendant's action.

Defendants correctly compare this case with <u>Gentile v. Fifth Ave. Otolaryngology, Inc.</u>, No. 4:05-cv-2936, 2006 WL 250591, (N.D. Ohio Aug. 28, 2006). In <u>Gentile</u>, a physician brought suit under the Sherman Act after he lost his staff privileges at defendants' facilities. The allegations of injury were limited to harm suffered by plaintiff personally. The court found that this harm did not constitute an antitrust injury because the "loss of staff privileges does not harm the consumer of medical services, but simply constitutes a personal harm to the individual physician." 2006 WL 2505915, at *6 (internal quotation marks omitted). The court noted that plaintiff had not shown that "other otolaryngology doctors have been excluded from the marketplace; that patients are unable to find alternatives to the Defendants for their otolaryngological needs; or that Dr. Gentile himself is incapable of competing in the relevant market." <u>Id</u>. <u>See</u> <u>also</u> <u>Austin v. McNamara</u>, 979 F.2d 728 (9th Cir. 1992) (injury to a single physician-competitor, rather than injury to market competition, does not establish an antitrust injury).

Such is the case here. Plaintiff has failed to show an antitrust injury, and his claim under the Sherman Act fails as a matter of law. <u>HyPoint Tech., Inc. v. Hewlett-Packard Co.</u>, 949 F.2d 874, 877 (6th Cir. 1991).

**C.     Defamation**

Plaintiff's final claim is for defamation. "Defamation is the unprivileged publication of a false and defamatory matter about another." <u>McCartney v. Oblates of St. Francis deSales</u>, 80 Ohio App.3d 345, 353, 609 N.E.2d 216. (Ohio Ct. App. 1992). Ohio law expressly provides a privilege for communications made during the process of health care peer review. "Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider, including both individuals who provide health care and entities that provide health care, arising out of matters that are the subject of evaluation and review by the peer review committee." O.R.C. § 2305.252(A); <u>see</u> <u>also</u> O.R..C. § 2305.251 (immunity from damages for peer review committees and their members). Courts therefore have rejected defamation claims

where the allegedly defamatory statements occurred within the scope of the peer review process. See Atkins v. Walker, 3 Ohio App.3d 427, 445 N.E.2d 1132 (Ohio Ct. App. 1981); Wall v. Ohio Permanente Med. Grp., Inc., 119 Ohio App.3d 654, 695 N.E.2d 1233 (Ohio Ct. App. 1997). Cf. Jacobs v. Frank, 60 Ohio St. 3d 111, 573 N.E.2d 609 (Ohio 1991) (in a libel action, recognizing a privilege to individuals who in good faith provide information to a medical licensing board because the privilege will "aid in the dissemination of information to those boards, thereby improving the quality of health care administered to the general public").

The complaint does not identify any specific statements that were defamatory, but simply alleges that defendants made "false statements" which put Dr. Emlich's fitness as a physician in a "negative light." (Doc. 1 at ¶ 73). Given that the complaint's factual allegations (id. at ¶¶ 25-36) concern only the peer review process, the court must infer that any allegedly defamatory statement was made in the context of that process. Because communications made during the peer review process are privileged, plaintiff's defamation claim fails as a matter of law.

**IV.     Conclusion**

Accordingly, defendants' motion for summary judgment (doc. 40) is GRANTED, and the Clerk of Court shall enter judgment for the defendants on all claims.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: April 19, 2018